**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| BLACK LIVES MATTER CHICAGO; BLACK ABOLITIONIST NETWORK; CHICAGO DEMOCRATIC SOCIALISTS OF AMERICA; GOOD KIDS/MAD CITY; #LETUSBREATHE COLLECTIVE; SOUTH SIDERS ORGANIZED FOR UNITY AND LIBERATION; NATIONAL LAWYERS GUILD CHICAGO; FIRST DEFENSE LEGAL AID; and WASHINGTON-BALTIMORE NEWS GUILD, CWA LOCAL 32035, IN THESE TIMES UNIT, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No.    C |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| CHAD WOLF; ALYSA ERICHS; MATTHEW T. ALBENCE; MARK A. MORGAN; WILLIAM BARR; L. ERIC PATTERSON; RICHARD K. CLINE; DONALD W. WASHINGTON; CHRISTOPHER WRAY; TIMOTHY J. SHEA; REGINA LOMBARDO; and UNKNOWN AGENTS AND OFFICERS OF THE UNITED STATES 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFFS' COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| Defendants. | ) ) |  |

**COMPLAINT**

Plaintiffs BLACK LIVES MATTER CHICAGO; BLACK ABOLITIONIST

NETWORK; CHICAGO DEMOCRATIC SOCIALISTS OF AMERICA; GOOD

KIDS/MAD CITY; #LETUSBREATHE COLLECTIVE; SOUTH SIDERS

ORGANIZED FOR UNITY AND LIBERATION; NATIONAL LAWYERS GUILD CHICAGO; FIRST DEFENSE LEGAL AID; and WASHINGTON-BALTIMORE NEWS GUILD, CWA LOCAL 32035, IN THESE TIMES UNIT, by their undersigned attorneys, hereby complain against Defendants CHAD WOLF, Acting Secretary of the U.S. Department of Homeland Security; ALYSA ERICHS, Acting Executive Associate Director, U.S. Homeland Security Investigations; MATTHEW T. ALBENCE, Deputy Director of the U.S. Immigration and Customs Enforcement; MARK A. MORGAN, a senior official currently performing the duties of the Commissioner of the U.S. Customs and Border Protection; WILLIAM BARR, Attorney General of the United States; L. ERIC PATTERSON, Director of Federal Protective Services; RICHARD K. CLINE, Principal Deputy Director of the Federal Protective Services; DONALD W. WASHINGTON, Director of the U.S. Marshals Service; CHRISTOPHER WRAY, Director of the Federal Bureau of Investigation; TIMOTHY J. SHEA, Acting Administrator of the U.S. Drug Enforcement Agency; REGINA LOMBARDO, Acting Director of the U.S. Bureau of Alcohol, Tobacco, Firearms; and UNKNOWN AGENTS AND OFFICERS OF THE UNITED STATES 1-10, and state as follows:

## INTRODUCTION

1.      The President and his appointees are sending federal agents to the streets of Chicago in order to intimidate and falsely arrest civilians who are exercising their constitutional right to speak and to assemble.

2.     Federal authorities have promised to deploy in Chicago the same secret police force that has terrorized the people of Portland, Oregon for more than a week, where civilians have been kidnapped, beaten, and tear gassed by anonymous federal agents.

3.     Rarely in modern times has a President of the United States trampled on bedrock constitutional protections on this scale or so brazenly usurped states' police power by directing federal agents to carry out an illegal mission against the people for his own personal political benefit.

4.     Plaintiffs have been engaged intensively in peaceful protest in Chicago for the past eight weeks, and they and their members have additional peaceful protests planned for today and the immediate future.

5.     Plaintiffs are entitled to this Court's protection of their constitutional right to peacefully protest. This Court must check the unrestrained and unlawful actions of the executive branch.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, the First and Fourth Amendments to the United States Constitution, and 5 U.S.C. § 702, *et seq.*

7.     The Court is authorized to award the requested declaratory and injunctive relief by the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Administrative Procedures Act, 5 U.S.C. § 706; and the Court's equitable powers.

8.     Venue is proper under 28 U.S.C. § 1391(b). Defendants are United States agencies or officers sued in their official capacities. Plaintiffs are residents of the State of Illinois, and the events giving rise to this complaint occurred and are likely to continue occurring in the State of Illinois, within the City of Chicago.

9.     Venue is also proper under 28 U.S.C. § 1391(e)(1) because Defendants are officers or employees of the United States acting in their official capacity, and at least one Plaintiff resides in this district or a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

10.     Plaintiff BLACK LIVES MATTER CHICAGO is an organization that fights for justice alongside the families most impacted by racially motivated violence and marginalization of Black communities, while working to create just and equitable systems. Black Lives Matter (BLM) Chicago works to end state violence and criminalization of Black communities by deconstructing the white supremacist, capitalist patriarchy. Individual members of BLM Chicago regularly plan and participate in protests and political actions, have participated in the recent protests in Chicago, and are likely to be subjected to constitutional violations by the Defendants under the policies and practices described herein, including but not limited to violations of their First Amendment rights and false arrests and detentions. These constitutional violations would require BLM Chicago to spend additional time and resources providing support to its members, diverting resources away from BLM's mission of creating just and equitable systems for all. BLM

4

Chicago brings this action on its own behalf and as an organizational representative for its members.

11.    Plaintiff BLACK ABOLITIONIST NETWORK (BAN) is a network of organizers, strategists, and activists who provide strategic support to the movement. BAN members conduct mass trainings, teach-ins and town halls for community members. Individual members of BAN regularly plan and participate in protests and political actions, have participated in the recent protests in Chicago, and are likely to be subjected to the constitutional violations by the Defendants under the policies and practices described herein, including but not limited to violations of their First Amendment rights and false arrests and detentions. These constitutional violations would require BAN to spend additional time and resources providing support to its members, diverting resources away from BAN's mission of providing support to movements and increasing the capacity of community members involved in movement work. BAN brings this action on its own behalf and as an organizational representative for its members.

12.    Plaintiff CHICAGO DEMOCRATIC SOCIALISTS OF AMERICA (CDSA) is an organization of over 2,500 members in Cook County, Illinois and an Illinois corporation. As part of pursuing its political mission, it engages in peaceful mass protest against violent police repression of the working class. Through its online magazine, newsletter, podcast, and other media channels, CDSA and its individual members are also engaged in journalism on the subject of the recent uprisings responding to police violence against the working class. Individual

members of DSA regularly plan and participate in protests and political actions, have participated in the recent protests in Chicago, and are likely to be subjected to the constitutional violations by the Defendants under the policies and practices described herein, including but not limited to violations of their First Amendment rights and false arrests and detentions. These constitutional violations would require CDSA to spend additional time and resources providing support to its members, diverting resources away from CDSA's mission of creating a more equitable world by establishing socialism as a political force. DSA brings this action on its own behalf and as an organizational representative for its members.

13. Plaintiff GOOD KIDS/MAD CITY (GKMC) are young Black and Brown people united in fighting to end violence in their cities. They work to achieve more resources for underserved communities on the South Side and West Side of Chicago and provide support to young people affected by violence. Individual GKMC members regularly plan and participate in protests, have participated in the recent protests in Chicago, and also have launched "love marches" to encourage communities to resolve conflicts peacefully. They are likely to be subjected to the constitutional violations by the Defendants under the policies and practices described herein, including but not limited to violations of their First Amendment rights and false arrests and detentions. When these constitutional violations occur, GKMC must divert time and resources from its mission of reducing violence and improving equality in underserved neighborhoods.

14.     Plaintiff #LETUSBREATHE COLLECTIVE is a collaborative of artists and activists that serves communities directly impacted by mass criminalization, police violence, and systemic injustice by centering marginalized voices and dismantling oppressive systems. Through direct action and cultural events, #LETUSBREATHE COLLECTIVE aims to organize artists to love and transform themselves and their communities through radical imagination and creative healing work. Individual members of #LETUSBREATHE COLLECTIVE regularly plan and participate in protests and political actions, have participated in the recent protests in Chicago, and are likely to be subjected to the constitutional violations by the Defendants under the policies and practices described herein, including but not limited to violations of their First Amendment rights and false arrests and detentions. When these constitutional violations occur, #LETUSBREATHE COLLECTIVE must divert time and resources from its mission of promoting radical healing work in underserved communities.

15.     Plaintiff SOUTH SIDERS ORGANIZED FOR UNITY AND LIBERATION ("SOUL") is a membership organization that consists of more than two dozen faith based organizations and community organizations on the Southside of Chicago, that organizes the communities in which its member organizations operate to fight for low-income people of color in the Chicago southland to build power and leverage that power to fight for their own interest and liberation. SOUL partners with their membership organizations and trains them and other community activists and leaders in organizing strategies specifically designed to

build leadership and impact public policy and legislation on multiple issues including housing, health care, education, economic development, employment, youth services and public safety policy. For the last two months, SOUL has focused its organizing on public safety policy and has activated many of the members and congregants of its membership organizations and congregations to participate in protests to encourage smarter public safety strategies that involve less policing and more resources in disinvested communities. Individual staff and members of SOUL regularly plan and participate in protests and political actions, have participated in the recent protests in Chicago, and are likely to be subjected to the constitutional violations by the Defendants under the policies and practices described herein, including but not limited to violations of their First Amendment rights and false arrests and detentions. When these constitutional violations occur, SOUL must divert time and resources from its mission of promoting radical healing work in underserved communities.

16. Plaintiff NATIONAL LAWYERS GUILD CHICAGO (NLG Chicago) is an organization of lawyers, law students, legal workers, and jailhouse lawyers who operate as a political and social force, working to build a world where human rights are regarded as more sacred than property interests. Individual members of NLG Chicago have been subject to aggressive policing and incommunicado detention by virtue of their advocacy in support of First Amendment-protected protest activity. NLG Chicago provides "Legal Observers" who document police behavior during protests, including the most recent ones opposing police violence. It

also provides legal representation to protesters who are arrested. Individual members of NLG Chicago regularly attend protests as Legal Observers, have participated in the recent protests in Chicago, and are likely to be subjected to the constitutional violations by the Defendants under the policies and practices described herein, including but not limited to violations of their First Amendment rights and false arrests and detentions. When these constitutional violations occur, NLG Chicago is forced to divert time and resources away from their mission of protecting members' and clients' civil rights and liberties during protests. Furthermore, when Legal Observers are arrested during protests, NLG Chicago loses the ability to provide oversight of police activities and treatment of protesters. NLG Chicago is further forced to divert resources to find other Legal Observers to cover the duties of arrested members.

17.     Plaintiff FIRST DEFENSE LEGAL AID (FDLA) was originally a pro bono nonprofit that provided free representation at police stations in Chicago. This was its purpose for nearly a quarter century until it organized its mission out of existence by fighting for and achieving a Cook County-wide policy that calls for the Cook County Public Defender to represent arrestees at police stations in Chicago and throughout Cook County. FDLA still maintains a hotline that sends callers looking for police station representation to the Public Defender, and therefore uses resources when those calls are made. But the primary two functions of FDLA are now different. First, FDLA continues to employ attorneys that represent pro bono individuals that have low-damage civil rights cases against the City of Chicago

when no private firm will take that case. Second, FDLA operates a hotline that provides non-police alternatives for community members that do not want to call police to deal with issues such as mental health disturbances, suicidal relatives, domestic disturbances, homeless people, minor trespassing, etc. This hotline is the model of what local jurisdictions including Chicago should be doing to de-escalate violent interactions between police and citizens. Lastly, FDLA has some community navigators that work with community activists and leaders to organize for community power and say so in public policy including public safety public policy. Every aspect of FDLA's operations will see its resources stressed by the presence of federal law enforcement in Chicago. This includes its navigators' desires to engage in public policy action being tempered.

18.     Plaintiff WASHINGTON-BALTIMORE NEWS GUILD (WBNG), COMMUNICATION WORKERS OF AMERICA (CWA) LOCAL 32035, IN THESE TIMES UNIT, is a bargaining unit representing journalists and communication workers. This unit of the WBNG is also referred to as the "In These Times Union," and is comprised of journalists and other workers employed by the publication, *In These Times*. *In These Times* is an independent, nonprofit magazine which is dedicated to advancing democracy and economic justice, informing movements for a more humane world, and providing an accessible forum for debate about the policies that shape the future. *In These Times* is based in Chicago and covers topics of social and political interest, with a focus on movements for social change, including the Black Lives Matter movement and other movements calling to defund police

departments. In order to effectively report on these movements, members of the In These Times Union have attended protests against police violence in Chicago and intend to continue to do so. Individual members of the In These Times Union are likely to be subjected to constitutional violations by Defendants, including but not limited to violations of their First Amendment rights.

19.     Plaintiffs bring this action on their own behalf and on behalf of their members.

20.     Defendant CHAD WOLF is acting secretary of the U.S. Department of Homeland Security (DHS). DHS is a Cabinet-level Department of the U.S. government. Its stated missions involve anti-terrorism, border security, immigration, and customs. It was created in 2002, combining 22 different federal departments and agencies into a single Cabinet agency.

21.     Defendant ALYSA ERICHS is Acting Executive Associate Director, U.S. Homeland Security Investigations (HSI). HSI is an investigative arm of DHS which states as its goal: "[C]ombating criminal organizations illegally exploiting America's travel, trade, financial and immigration systems." HSI's legal authority allows it to investigate only cross-border criminal activity relating to "financial crimes, money laundering and bulk cash smuggling; commercial fraud and intellectual property theft; cybercrimes; human rights violations; human smuggling and trafficking; immigration, document and benefit fraud; narcotics and weapons smuggling/trafficking; transnational gang activity; export enforcement; and, international art and antiquity theft."

11

22.     Defendant MATTHEW T. ALBENCE is Deputy Director and the senior official currently performing the duties of the Director of the U.S. Immigration and Customs Enforcement (ICE), an agency housed within DHS.  Its stated mission is "to protect America from the cross-border crime and illegal immigration that threaten national security and public safety."

23.     Defendant MARK A. MORGAN is the senior official currently performing the duties of the Commissioner of the U.S. Customs and Border Protection (CBP). CBP is an agency within DHS. Its stated mission is "[t]o safeguard America's borders thereby protecting the public from dangerous people and materials while enhancing the Nation's global economic competitiveness by enabling legitimate trade and travel."

24.     Defendant WILLIAM BARR is Attorney General of the United States, and in that position oversees the U.S. Department of Justice.

25.     Defendant L. ERIC PATTERSON is Director of Federal Protective Services. Federal Protective Services (FPS) is a division of DHS. Its mission is "[t]o prevent, protect, respond to and recover from terrorism, criminal acts, and other hazards threatening the U.S. Government's critical infrastructure, services, and the people who provide or receive them." According to its website, it is responsible for guarding 9,000 federal facilities and employs more than 1,300 officers, agents, and support staff who are responsible for overseeing another 13,000 private contractors.

26.     Defendant RICHARD K. CLINE is the Principal Deputy Director of the FPS. According to his official DHS biography, he "serves as an extension of the Director and operates with full authority to execute the mission of the FPS."

27.     Defendant DONALD W. WASHINGTON is Director of the U.S. Marshals Service. The U.S. Marshals Service is an agency within and under the control of the U.S. Department of Justice. According to a Fact Sheet on its website, "it is the enforcement arm of the federal courts, involved in virtually every federal law enforcement initiative." The U.S. Marshals Service's Special Operations Group says it is "deployed in high-risk and sensitive law enforcement situations, national emergencies, civil disorder and natural disasters."

28.     Defendant CHRISTOPHER WRAY is Director of the Federal Bureau of Investigation (FBI). The Federal Bureau of Investigation is an agency within the U.S. Department of Justice.

29.     Defendant TIMOTHY J. SHEA is the Acting Administrator of the U.S. Drug Enforcement Agency (DEA). The DEA is a federal law enforcement agency under the U.S. Department of Justice. According to its website, the mission of the DEA is to enforce the controlled substances laws and regulations of the United States and bring to the criminal and civil justice system of the United States, or any other competent jurisdiction, those organizations and principal members of organizations, involved in the growing, manufacture, or distribution of controlled substances appearing in or destined for illicit traffic in the United States; and to recommend and support non-enforcement programs aimed at reducing the

availability of illicit controlled substances on the domestic and international markets.

30.     Defendant REGINA LOMBARDO is Acting Director of the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). According to the ATF's website, "ATF is a law enforcement agency in the United States' Department of Justice that protects our communities from violent criminals, criminal organizations, the illegal use and trafficking of firearms, the illegal use and storage of explosives, acts of arson and bombings, acts of terrorism, and the illegal diversion of alcohol and tobacco products. We partner with communities, industries, law enforcement, and public safety agencies to safeguard the public we serve through information sharing, training, research, and use of technology."

31.     UNKNOWN AGENTS AND OFFICERS OF THE UNITED STATES 1–10 are unidentified agents and officers of the federal agencies listed in this complaint, acting under color of federal law and within the scope of their employment and duties with the respective agencies by which they are employed or for which they are agents.

## FACTS

## I.     PLAINTIFFS ARE ENGAGED IN PEACEFUL PROTESTS

### A.     Peaceful Protests in Chicago in 2020

32.     On May 25, 2020, Minneapolis police officers murdered George Floyd, who was handcuffed and lying face down on the ground, by suffocating him to death in broad daylight on the street.

14

33.     Floyd's murder and the police murder of Breonna Taylor in Louisville, Kentucky, in addition to recent police murders of other Black people in the United States sparked the largest movement for social and racial justice in history and has included peaceful protests around the world against anti-Black police violence, systemic racism, and inequality.

34.     In Chicago, Plaintiffs are the leaders of this movement against anti-Black racism and for human rights and social justice.

35.     Since the end of May 2020, there have been nearly daily protests and actions throughout the city of Chicago, ranging in size from a few dozen people to thousands. These protests have occurred throughout Chicago, in the Loop, and the South, West and North sides.

36.     Plaintiffs have been part of the largest global movement for human rights in recent memory. The Plaintiffs Black Lives Matter Chicago, Black Abolitionist Network, Chicago Democratic Socialists of America, Good Kids/Mad City, #LetUsBreathe Collective, South Siders Organized for Unity and Liberation, and their membership have been in the streets protesting police brutality as part of the movement for Black lives.

37.     Legal observers associated with the Plaintiffs National Lawyers Guild Chicago and First Defense Legal Aid have been attending the protests to document police activity and police constitutional violations.

38.     Members of Plaintiff Washington-Baltimore News Guild, CWA Local 32035, In These Times Unit have been present at protests to report on the historic protests as well as on the police response.

**B.     Violence by the Chicago Police During Peaceful Protests**

39.     The Chicago Police Department (CPD) has responded—and continues to respond—to these protests with brutal, violent, unconstitutional tactics that are clearly intended to silence protestors.

40.     CPD officers consistently target protesters with unlawful, retaliatory and lethal force. Officers' animus against protesters is unmistakable—they regularly refer to protestors with terms that are vile, misogynistic, and anti-gay. CPD also targets protester's property—destroying cameras, phones, eyeglasses and confiscating bikes, backpacks, and other belongings.

41.     Protesters often report that CPD officers intentionally strike them on their head with batons with enough force to leave people bloodied and in some instances with serious concussions.

42.     On June 23, 2020, the Chicago Reader published an in-depth examination of the CPD's use of lethal force during the May 2020 protests. The reporter documented "83 baton strikes on at least 32 different people by officers, most captured on video. Nearly all appear to violate [CPD] policy with more than half of the strikes on video involving police beating people who were already on the ground. Multiple videos also show officers hitting protesters in the head with batons despite rules limiting these strikes to situations requiring deadly force." The Reader

article notes that these unlawful uses of force often occurred in full view of supervisors who failed to intervene and that most officers failed to report their uses of force.

43. CPD's brutal response has also included police officers tackling protesters to the ground, kneeing protesters in the neck and back, kicking protesters in the legs to cause them to fall, trapping protesters on bridges, pushing protesters stranded on bridges, pinning protesters against hard surfaces, using tear gas and pepper spray, dragging protesters through the streets, punching protesters in the face, stomping on protesters on the ground, and beating protesters severely.

44. Protesters widely report that CPD targets those it has identified as protest marshals or leaders with the most brutal violence apparently as part of a strategy to quell the protesters' free expression. CPD also was particularly violent with protesters who expressed concern that CPD was harming other people. Protestors repeatedly reported that CPD officers pushed, shoved, battered, and harassed people who were filming acts of police brutality during the uprisings. Often this resulted in confiscated or damaged camera and physical injury to protesters exercising their First Amendment right to record the police.

45. People of all races who interact with CPD officers during protests report that officers are aggressive, rude, disrespectful, and often affirmatively escalate encounters through taunts, shoves, pushes and other inappropriate behavior. CPD officers used particularly hostile language towards women and members of the LGBTQ community.

46. CPD's response to the protests also reflects a pattern and practice of breaking, stealing, or otherwise disposing of protestors' belongings, including bikes, cameras, glasses, goggles and, in some instances, canes used to assist with mobility.

47. CPD has also engaged in a systemic practice of illegal searches of protesters, seizure of protesters, and false arrest of protesters.

48. Throughout these events, Mayor Lori Lightfoot has praised the police for their "restraint."

**C. Chicago's History of Illegal Force, Arrest, Detention, and Surveillance of Protestors**

49. CPD has long used excessive force and false arrest at protests, including in recent years, at the Black Lives Matters protests and the protests against the NATO Summit in 2012.

50. CPD has a long history of surveillance of protesters. This has included sending law enforcement infiltrators to surveil protest groups and using technology to surveil the communications of protesters and organizers.

51. CPD has long operated an unconstitutional detention center at the intersection of South Homan Street and West Filmore Avenue (hereinafter "Homan Square"). CPD has brought thousands of people—predominately and disproportionately Black and Latinx people—to Homan Square and interrogated them using unconstitutional tactics including: physical threats and assaults, denial of food, water, bathrooms, and sleep, placing individuals in cells with the overwhelming stench of human feces and urine, psychological coercion, threats of false charges, and racial slurs. CPD has used these interrogations to try to obtain

18

information from individuals. CPD holds these individuals for long periods of time, without allowing them access to legal counsel or taking them before a judge, and without revealing their whereabouts to concerned friends, family members, or counsel. In other words, the activities of CPD at Homan Square proceed under a shroud of secrecy without any judicial or public oversight.

## II. THE PRESIDENT HAS DEPLOYED A SECRET POLICE FORCE

### A. President Trump's Threats to Use Force Against Civilians

52. President Donald Trump has long fancied himself a strongman leader better suited for a dictatorship than a democracy.

53. He has maligned the nation's cities, including Chicago, Portland, and New York, saying they are "run" by "Radical Left Democrats" who, in his view, will "destroy our Country as we know it."

54. The President has continually spoken out against peaceful protestors, even directing his agents to clear peaceful protestors from public grounds outside of the White House through the use of physical force and chemical weapons.

55. On June 1st, 2020, some 350 CBP officers were deployed to Washington, D.C. to patrol the protests. CBP's Acting Commissioner Mark Morgan defended this deployment in a tweet stating that: "These 'protests' have devolved into chaos & acts of domestic terrorism by groups of radicals & agitators. @CBP is answering the call and will work to keep DC safe."

56. Repeatedly, the President has warned the nation's cities that he will use similar force against their civilians to end peaceful protest.

57.     To this end, on June 26, 2020, the President signed an Executive Order on "Protecting American Monuments, Memorials, and Statues, and Combating Recent Criminal Violence," in which he fulminated against the protests in American cities and gave federal law enforcement and military leave to "assist" in protecting federal property for the next six months.

58.     On July 1, 2020, CBP circulated a memorandum to CBP officers detailing their mission in Portland as a response to the President's recent Executive Order.

59.     The July 1st CBP Memo explained that the Acting Secretary of DHS, Chad Wolf, created the DHS Protecting American Communities Task Force, which would "provide an ongoing assessment of potential civil unrest and property destruction and to address resource allocation and potential surge activity to ensure the continuing protection of people and property."

60.     The July 1st CBP Memo further explained that DHS has decided along with other departments and agencies that it is "in the public interest and fiscally sound for the Federal Protective Services . . . to partner with other federal law enforcement to execute the directive of the President. To that end, DHS began coordination with the Department of Justice (DOJ) and Department of the Interior (DOI) to establish information/intelligence sharing[.]"

61.     The July 1st CBP Memo goes on to explain that CBP officers were to be deployed to cities across the country for the July 4th weekend.

62.   Defendant Wolf announced on July 3, 2020 that DHS was "following [President Trump's] lead in deploying special units to defend our national treasures from rioters." He also stated, "We won't stand idly by while violent anarchists and rioters seek not only to vandalize and destroy the symbols of our nation, but to disrupt law and order and sow chaos in our communities," and "civil unrest will not be tolerated."

63.   CBP officers, and upon information and belief, other federal agents, have been deployed in undisclosed cities throughout the country in response to the nationwide protests, or what DHS calls "civil unrest" or "disruptive activity." One of these locations was Portland, Oregon.

## B.    The Secret Police Terrorize Portland

64.   Starting on or about July 1, 2020, President Trump gave life to his authoritarian vision for our cities, sending unidentified federal agents to the streets of Portland, Oregon.

65.   For several weeks, a paramilitary force of agents of the DHS, as well as other federal agents known and unknown to Plaintiffs, have been deployed on Portland streets.

66.   It has been reported in the media that the camouflaged federal troops sent to Portland were officers from several federal agencies, including not only CBP, but also the U.S. Marshals Service.

67. These federal agents dressed in camouflage, fatigues, and tactical gear, without any insignia or information identifying them. They have used batons, tear gas, rubber bullets, and munitions on protesters, journalists, and legal observers.

68. They have used such force and intimidation despite the fact that protestors, journalists, and legal observers were not committing any federal crimes, and were not doing anything threatening whatsoever.

69. For example, federal agents shot unarmed protester Donavan LaBella in the head with a munition, reportedly fracturing his skull.

70. On July 12, 2020, while journalist Mathieu Lewis-Rolland was documenting protests in Portland, federal agents shot him in the side and back ten times with hard plastic bullets that tore holes into his "PRESS" t-shirt, despite his clear identification as press, and despite that he was carrying bulky camera equipment, staying in well-lit areas, and posing no threat to anyone.

71. Journalist Garrison Davis was also covering protests in Portland on the night of July 11, 2020 and the early morning of July 12, wearing a helmet that said "PRESS" on it in big block letters, holding his press pass, and not participating in protests. Though he posed no threat to anyone, a federal agent shot him in the back with a tear gas canister, pepper bullets, and other munitions.

72. Egregiously, federal agents beat and pepper-sprayed a Navy veteran, Christopher David, who went to the protests to ask the federal agents whether they thought they were upholding the U.S. Constitution with their actions. In response,

the agents beat him (breaking his hand) and pepper sprayed him in the face, despite the fact that David posed no threat.

73.     Indeed, even when a "wall of mothers"—women, some of whom were pregnant—stood in front of the protestors peacefully, arm-and-arm, and chanted things like "leave our kids alone," the federal agents terrorized them with chemical weapons and other acts of violence.

74.     On July 16, 2020, another Memorandum was sent to Chad Wolf as Acting Secretary of DHS (July 16th DHS Memo).

75.     This July 16th DHS Memo stated that acting in response to President Trump's Executive Order CBP and ICE had "mobilized tactical teams to provide support to [FPS] in protecting federal buildings and assets within the greater Portland, Oregon area."

76.     Further, the July 16th DHS Memo explains how the U.S. Marshals Service "deployed their Special Operations Group (USMS/SOG) to further assist FPS in the protection of the Mark O. Hartfield Federal Courthouse in Portland," and that the "U.S. Secret Service, . . . ICE/HSI, and the . . . FBI have also provided investigative support to FPS."

77.     While in Portland, these CBP officers reportedly entered sections of the city where residents were peacefully protesting racial and social injustice.

78.     CBP officers in Portland were wearing generic green law enforcement uniforms with no identifying insignias. These CBP officers then approached

protesters in unmarked vehicles, in some instances far from any federal property, buildings, or monuments they were deployed to protect.

79.     On July 15, 2020, armed federal agents dressed in camouflage pulled Mark Pettibone into an unmarked van without identifying themselves, drove him to what is believed to have been a federal courthouse, and detained him in a cell before releasing him without any paperwork, citation, or record of his arrest.

80.     Another protester in Portland reported that she and others were standing and talking to one another when they heard a fellow protester yell that a "snatch van" was approaching. She described these officers, later determined to be CBP agents, as "putting bags over [protesters'] heads, and putting them in out-of-state plated vans." The CBP issued a statement confirming that its agents were responsible for this lawless kidnapping of a civilian from the streets of Portland.

81.     The July 1st CBP Memo and the July 16th DHS Memo each outline the coordination between subagency officers and agents of DHS, DOJ, and DOI which has been ongoing throughout the summer since in response to nationwide protests.

82.     According to Ken Cuccinelli, the Acting Deputy Secretary of Homeland Security, the Hatfield courthouse in Portland is protected by the FPS. The Acting Deputy Secretary explained that CBP and ICE officers were called in to support FPS and, thus, that FPS was directing the involvement by CBP, ICE, and other DHS officers.

83.     Defendant Wolf has publicly stated that 43 arrests have been made in relation to operations in Portland since the weekend of July 4th, including by teams of FPS and CBP officers working together. It is unknown how many instances have resulted in unauthorized searches, questioning, or seizure and temporary detention. It is also unknown which agencies have carried out exactly which arrests, searches, detainments, or custodial interrogations.

84.     The President and his appointees and officers have tried to characterize these incidents of detainment and arrests as a response to individuals destroying federal property. For example, DHS Acting Deputy Secretary Ken Cuccinelli stated in an interview with NPR that "We're talking only about violent rioters. We're not talking about actual protesters. We're not seeking to interfere at all with anyone peacefully expressing themselves—period, full stop."

85.     However, incidents like what happened to Mark Pettibone show otherwise—that protesters could do nothing more than walk down the street and still be subject to search, arrest, and hours of detainment.

86.     Oregon Governor Kate Brown has called the federal agents' conduct in Portland "a blatant abuse of power," and has criticized the Trump Administration for intentionally "provok[ing] confrontation for political purposes."

87.     In a letter co-signed by the mayors of five other cities, including Chicago's Mayor, Portland Mayor Ted Wheeler criticized the federal agents for using "tactics we expect from authoritarian regimes—not our democracy" and

confirmed that "the irresponsible actions of [the federal] agencies threaten community safety."

88.     Oregon's Attorney General has filed a federal lawsuit seeking to enjoin the federal agents from continuing to engage in their unlawful tactics.

89.     Oregon's Governor has requested the removal of federal agents from Portland's streets, as has Mayor Wheeler, but Defendant Wolf has refused.

90.     The *modus operandi* of the paramilitary force of federal agents in Portland includes: (1) anonymous federal agents dressed in camouflage who bear no known designation and refuse to identify themselves; (2) the use of unmarked vehicles used to illegally arrest and detain and round up protestors, journalists, and observers; (3) kidnapping of innocent civilians without probable cause; (4) uses of excessive, inexcusable force against people exercising their right to speak and to assemble as well as people reporting on peaceful protests; and (5) "preemptive arrests" of people without probable cause to believe they committed any federal crime.

**C.      The Federal Policy of Conducting Illegal Arrests**

91.     On July 15, 2020, a video emerged showing camouflaged federal agents grabbing an individual off the street in Portland and placing him in an unmarked van.

92.     NLG Legal Observers who were recording the video objected to this kidnapping.

26

93. On July 17, 2020, an official U.S. Customs and Border Patrol statement confirmed that the camouflaged officers were CBP agents.

94. In a press conference on July 21, 2020, Defendant Wolf called on Defendant Cline to explain the "standard of probable cause" justifying these arrests.

95. Defendant Cline specifically addressed the July 15th unmarked officer arrests explaining that the CBP agents had identified a man "in a crowd and in an area" where someone was aiming a laser at officers, and they followed him to a calmer location to talk to him. After doing so, they removed him from the area where other protesters and observers were nearby and took him to another location in a van. They held him for approximately 20 minutes and then released him "because they did not have what they needed" to hold him.

96. In attempting to justify the constitutionality of this act, Cline characterized it as a "simple engagement" and "not a custodial arrest."

97. These Defendants' statements established a policy of allowing officers to make arrests without probable cause in violation of the Fourth Amendment.

98. Later the same day, Defendant Wolf stated that DHS was "having to go out and proactively arrest individuals . . . to hold them accountable."

99. Defendant Wolf's statement explaining DHS's authority to "proactively arrest" individuals further confirmed a federal policy that is being implemented by federal agents on city streets that contravenes the protections of the Fourth Amendment by sanctioning arrests without probable cause.

100.    President Trump has approved of the actions of the federal agents in Portland, thereby ratifying the federal agents' policy of arresting individuals without probable cause and justifying the continued and expanded use of unlawful arrests that agents employed in Chicago and other cities.

101.    For example, on June 20, 2020, President Trump stated "we've done a great job in Portland. . . . I guess we have many people in jail right now. We very much quelled it, and if it starts again, we'll quell it again very easily. It's not hard to do, if you know what you're doing."

102.    When the President and Defendants Wolf and Barr announced at their July 22, 2020 press conference that they would deploy a "surge" of federal agents to other cities, including Chicago, at no point did any of them or anyone else state that the policy of conducting unlawful or preemptive arrests like those conducted in Portland would not continue during the "surge" of officers being imminently deployed to Chicago.

**D.     The Secret Police Have Been Deployed to Chicago**

103.    Despite public outcry against these flagrant constitutional violations, the President has vowed to continue to use federal agents to mount a hostile takeover of U.S. cities.

104.    The President has said that his efforts in Portland were designed to "help" that city and that Chicago, among other cities, is next.

105.    These developments are unsurprising, given that on May 28, 2020, the President said that he would send the military to confront protesters and invoked

the racist phrase of a segregationist used to quell prior cries for racial equality: "When the looting starts, the shooting starts."

106. The President again made threats about deploying the National Guard to "dominate the streets" and using "thousands of heavily armed soldiers" against civilians.

107. On June 1, 2020, amid the protests in Washington, D.C., the President ordered police and National Guard troops to clear peaceful protestors from Lafayette Square and surrounding streets using tear gas and other weapons. This was done solely so that the President could walk from the White House to St. John's Episcopal Church, so that he could hold a Bible for a photo-op.

108. Other federal appointees and officers have also made clear the Administration's intention to replicate what is taking place in Portland elsewhere, including in Chicago.

109. Defendant Wolf announced that DHS was going to deploy agents to Chicago and would "do that whether they like us there or not."

110. In an interview on July 19, 2020, the President called Chicago "stupidly run" and pledged to have "more federal law enforcement" in Chicago and other cities "all run by liberal Democrats."

111. On July 22, 2020, the President held a news conference from the East Room of the White House confirming that there would be a "surge" of federal agents arriving imminently in Chicago.

112. During those remarks, the President was explicit that the federal law enforcement response is needed to address problems purportedly caused by the activities and demands of protestors, and that federal agents would help to restore order in Chicago.

113. In addition, neither the President, Defendant Barr, nor Defendant Wolf gave any assurance that the "hundreds" of federal agents flooding Chicago would leave protestors alone. At no time did they acknowledge that the federal government had overstepped in Portland. At no time did they agree that the federal law enforcement activities currently taking place in Portland would be limited to Portland.

114. On the contrary, the President and Defendants made clear that there would soon be an unchecked federal presence on the streets of Chicago, with the President describing federal authority as "as wide as it can be."

115. The President and Defendants repeatedly tied the decision to send federal law enforcement officers to Chicago to the actions of protesters, blaming protesters for violence in Chicago.

116. The President cited "a radical movement to defund, dismantle and dissolve our police departments" that "has led to a shocking explosion of shootings, killings, murders, and heinous crimes of violence." He complained that local "politicians have now embraced the far-left movement to break up our police departments causing violent crime in their cities to spiral . . . seriously out of control." He demanded that Americans "insist that community officials

fully support, fully back and fully fund their local police departments" and said federal law enforcement would remain until then. He repeated "[w]e will never defund the police, we will hire more great police" and "[w]hile others want to defund, defame and abolish the police, I want to support and honor our great police."

117.   Defendant Barr announced, "[W]e're going to continue to confront mob violence," and he claimed that "a significant increase in violent crime" is the "direct result of the attack on the police forces" and calls "for the defunding of police departments."

118.   All of this is consistent with the President's numerous statements since the beginning of the nationwide protests that he intends to use federal agents to stop protestors.

119.   For instance, the President tweeted: "Get tough Democrat Mayors and Governors. These people are ANARCHISTS. Call in our National Guard NOW. The World is watching and laughing at you and Sleepy Joe. Is this what America wants? NO!!!" This early suggestion that the National Guard was needed to quell actions of particular political groups or protesters with political leanings, such as "anarchists," makes clear that the aim in calling in federal officers is to quell protests—not just those committing crimes against property.

120.   The President has expressed his disdain for the viewpoints of the protestors: "Our great National Guard Troops who took care of the area around the White House could hardly believe how easy it was. "A walk in the park", one said.

The protesters, agitators, anarchists (ANTIFA), and others, were handled VERY easily by the Guard, D.C. Police, & S.S. GREAT JOB!"

121.    The President has indicated his intention to "dominate" protestors: "D.C. had no problems last night. Many arrests. Great job done by all. Overwhelming force. Domination. Likewise, Minneapolis was great (thank you President Trump!)"

122.    The President has expressed satisfaction when protestors self-censor by staying home: "I have just given an order for our National Guard to start the process of withdrawing from Washington, D.C., now that everything is under perfect control. They will be going home, but can quickly return, if needed. Far fewer protesters showed up last night than anticipated!"

123.    At President Trump's rally at Mount Rushmore on July 4, 2020, he announced that he was "deploying federal law enforcement to protect our monuments, arrest the rioters, and prosecute offenders to the fullest extent of the law."

124.    Finally, in retweeting a thread which showed New York stores boarded up in anticipation of any violence following the continuation of nationwide protests, President Trump wrote, "The National Guard is ready!"

III.    **CHICAGO IS UNABLE OR UNWILLING TO STOP UNLAWFUL FEDERAL INTERVENTION**

125.    Chicago's Mayor has publicly recognized the problems with the President's secret police force, saying, "We don't need federal agents without any insignia taking people off the streets and holding them, I think, unlawfully."

126.   The Mayor has also recognized that an "influx" of federal agents to Chicago is on its way.

127.   In a July 20, 2020 letter to the President, Chicago's Mayor stated that federal agents deployed to Chicago "that would not be within our control or within the direct command of the Chicago Police would spell disaster."

128.   Chicago is already saturated with federal law enforcement agents who conduct duly authorized law enforcement activities in Chicago and the region on a daily basis.

129.   A further influx of such agents in lieu of investment in the communities most affected by gun violence, police violence, and racism is counterproductive, destructive, and a potentially violent disaster.

130.   Contrary to her stated position, on information and belief, Chicago's Mayor has had discussions with federal authorities about the initial deployment of federal agents in Chicago, and on July 21, 2020, she confirmed that federal agents would be deployed to Chicago.

131.   The assent of Chicago's Mayor to the surge of federal forces means that when the President sends federal agents to Chicago, as he did to Portland, the CPD and the City will be unable and unwilling to protect protestors from unlawful use of excessive force and arrests without probable cause.

## IV.   PLAINTIFFS FEAR CONTINUING THEIR LAWFUL ACTIVITIES

132.   Given the City of Chicago's history of violence against peaceful protestors, and its recent violence against protestors, the addition of federal forces

to illegally intimidate, police, and falsely arrest peaceful protestors will ignite additional official violence against civilians and a serious constitutional crisis within the City of Chicago.

133.   Indeed, recognizing these legitimate and imminent fears, State Representative Will Guzzardi, whose district overs the City of Chicago's northwest side, reports that his constitutes are "terrified by the news" of impeding federal agents, and that some have been dissuaded from protesting.

134.   Plaintiffs have planned frequent protests and political actions into the foreseeable future, including the weekend of July 24, 2020. Events are planned for July 24, 25, and 26, 2020, and additional events are expected during the following week. All of the Plaintiffs herein have made plans and put aside resources to participate in one or more activity this weekend, including: a) a #LetUsBreathe rally at Freedom Square on Friday, July 24, 2020, across the street from the Homan Square, a police station notorious for disappearing people (sometimes in conjunction with Federal DEA or ATF agents); b) a protest organized by multiple organizations including Plaintiffs BLM Chicago and CDSA on Saturday, July 25, 2020 in Grant Park to support Black Lives; c) another protest also in Grant Park on Saturday, July 25, 2020 to call for the abolition of ICE.

135.   NLG Chicago Legal Observers have observed over 50 demonstrations since the end of May 2020, when nationwide protests against systemic racism, inequality, and police violence, sparked by the murders of George Floyd and Breonna Taylor, began.

136.    Plaintiff NLG Chicago seeks to protect the First Amendment rights of protestors by observing protests and obtaining information from protestors who are arrested so that they can be tracked and provided pro bono or low-cost representation.

137.    Plaintiff FDLA seeks to protect the First Amendment rights of protesters by observing protests and obtaining information from protesters who are arrested so that they can be tracked and provided pro bono or low-cost representation.

138.    Plaintiff In These Times Union, has documented and tracked hundreds of instances of violence, harassment and arrests directed toward journalists by members of law enforcement of local, state, and federal agencies throughout the country. Individual members of In These Times Union are aware of "less lethal" munitions being deployed by federal agents against journalists covering protests in Portland and instances where members of the Chicago Police Department have used physical force to prevent journalists from covering protests.

139.    Plaintiffs are aware of the activities of federal law enforcement officers in Portland; specifically, they are aware that federal agents have kidnapped, falsely arrested, and brutalized protestors and NLG Legal Observers.

140.    Plaintiffs are also aware that President Trump is deploying federal officers to Chicago immediately, and that the CPD intends to work with the federal agents.

141.    Plaintiffs would like to continue exercising their First Amendment rights of speech, assembly, observing, and newsgathering, but they fear that federal agents will kidnap, falsely arrest, or physically abuse them.

142.    Specifically, Plaintiff BLM Chicago has members who are not going to attend the protests and rallies planned for this weekend because they fear federal agents will kidnap, falsely arrest, or physically abuse them, as they did to protestors in Portland.

## LEGAL CLAIMS

## COUNT I

### Interference with Speech, Peaceful Assembly, and the Press
### In Violation of the First Amendment

143.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

144.    Individuals who peacefully gather on the streets of Chicago to protest have the right to gather, express themselves, and petition for redress of grievances under the First Amendment.

145.    Members of the press and individuals have the right to gather, receive, record, and disseminate information and news under the First Amendment.

146.    Defendants' actions are undertaken with the intent of discouraging and suppressing lawful protest and therefore constitute an illegal prior restraint on individuals' First Amendment right to peacefully protest racial inequality.

147.    Many individuals who are reasonably afraid of being brutalized or picked up and shoved into unmarked vans by federal agents will feel compelled to

stay away, for their own personal safety, and will therefore be unable to express themselves in the way that they have the right to do.

148.    In the manner described more fully above, Plaintiffs' First Amendment rights have been and are being infringed. Their exercise of their rights to speak, assemble, petition, and gather news is being chilled due to the well-founded fear that they will be brutalized or kidnapped by federal agents for no reason other than being a protestor, journalist, or legal observer on the streets and sidewalks of Chicago.

## COUNT II

### Federal Policy of Conducting False Arrests
### In Violation of the Fourth Amendment

149.    Plaintiffs incorporate by reference each of the paragraphs of this Complaint as if restated fully herein.

150.    The Fourth Amendment prohibits unreasonable seizures, and in particular prohibits federal officials from arresting a person without probable cause to believe that they have committed a federal crime.

151.    In so doing, the Fourth Amendment also plainly prohibits "preemptive arrests" in anticipation of a possible violation of the law.

152.    Defendants and the federal agents discussed in this complaint are operating pursuant to an official federal policy, approved by responsible federal agency heads with final policymaking authority, of conducting arrests of individuals without probable cause to believe they have committed federal crimes, including "preemptive arrests" of peaceful protestors and journalists.

37

153.    Federal agents' conduct in other cities as described above, and in particular their false arrest of peaceful protestors and journalists, was caused by and pursuant to this unconstitutional federal policy.

154.    No probable cause exists to believe that Plaintiffs, their members, or any other similarly situated protestors, legal observers, or journalists, has committed a federal crime. Plaintiffs' anticipated participation in protests does not provide probable cause to believe that a person has committed a federal crime.

155.    In the absence of an injunction, Defendants will arrest and seize individuals off the streets in Chicago without probable cause, in violation of the Fourth Amendment, pursuant to official federal policy.

## COUNT III

### 28 U.S.C. § 2201
### Declaration of Rights

156.    Plaintiffs incorporate each of the paragraphs of the complaint as if restated fully herein.

157.    In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought, under 28 U.S.C. § 2201.

158.    There is an actual controversy within the jurisdiction of this court, inasmuch as one or more federal defendants have engaged in actions endangering Plaintiffs and others assembled on Chicago's streets. No federal authority has agreed to stop this practice.

159.    Plaintiffs are entitled to a declaration that the acts at issue are unlawful, and an injunction precluding Defendants from continuing in them.

## COUNT IV

## Conspiracy

160.    Plaintiffs incorporate each of the paragraphs of this complaint as if restated fully herein.

161.    Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to deprive Plaintiffs of their constitutional rights, all as described in the various paragraphs of this Complaint.

162.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiffs of these rights.

163.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

164.    The misconduct described herein was undertaken intentionally, in total disregard of Plaintiffs' constitutional rights.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for a judgment and the following relief:

1.    A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint restrain Plaintiffs' ability to assemble in peaceful protest, observing, and news gathering, in violation of the First Amendment;

2.     A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint constitute a federal unlawful policy of committing arrests without probable cause, in violation of the Fourth Amendment;

3.     A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint present an imminent threat that Plaintiffs will be arrested without probable cause, by unidentified federal agents, in violation of the Fourth Amendment; and

4.     An injunction, pursuant to 28 U.S.C. § 2202 and 5 U.S.C. § 702, permanently enjoining the Defendants from engaging in the federal actions described in this complaint, and specifically requiring that the Defendants and their officers and agents:

   a.  Refrain from interfering in or otherwise policing lawful and peaceful assemblies and protests in the City of Chicago;

   b.  Cease enforcement of their unlawful policy of conducting arrests without probable cause to believe a federal crime has been committed and conducting "preemptive arrests";

   c.  Refrain from arresting individuals in the City of Chicago without probable cause to believe that a federal crime has been committed;

   d.  Identify themselves and their agency before detaining or arresting any person off the streets of Chicago;

   e.  Explain to any person detained or arrested that the person is being detained or arrested and explain the basis for that action; and

   f.  Any other relief this Court deems proper.

Respectfully submitted,

**BLACK LIVES MATTER CHICAGO**, *et al.*

By: /s/ Theresa Kleinhaus
One of Plaintiffs' Attorneys

Jon Loevy
Heather Lewis Donnell
Steve Art
Theresa Kleinhaus
Julia Rickert
Lindsay Hagy
Ruth Brown
Sean Starr
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900

Brendan Shiller
SHILLER PREYAR JARARD & SAMUELS
@ THE WESTSIDE JUSTICE CENTER
601 S. California Ave.
Chicago, IL 60612
(312) 226-4590

Sheila Bedi
COMMUNITY JUSTICE AND
    CIVIL RIGHTS CLINIC
NORTHWESTERN PRITZKER
    SCHOOL OF LAW
375 E. Chicago Ave.
Chicago, IL 60611
(312) 503-8576

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
(720) 328-5642

David B. Owens
LOEVY & LOEVY
100 S. King St., Ste. 100
Seattle, WA 98104

Joey L. Mogul
G. Flint Taylor
Brad J. Thomson
Christian Snow
PEOPLE'S LAW OFFICE
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070

Craig B. Futterman
MANDEL LEGAL AID CLINIC
UNIVERSITY OF CHICAGO LAW
    SCHOOL
6020 S. University
Chicago, IL 60637
(773) 702-9611
futterman@uchicago.edu