UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BLACK LIVES MATTER CHICAGO, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | No. 20 C 4319 |
| v. | ) ) | Judge Pallmeyer |
| CHAD WOLF, *et al.*, | ) ) | |
| Defendants. | ) | |

## **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

# Table of Contents

Table of Authorities

Introduction .................................................................................................................1

Background ...............................................................................................................2

    I.     The Situation in Portland .....................................................................2

    II.    The Situation in Chicago ......................................................................4

    III.   Federal Law Enforcement Agencies ......................................................6

    IV.   Amended Complaint ..............................................................................7

Argument ...............................................................................................................10

    I.     Plaintiff's Lack Article III Standing ...................................................10

        A.    Plaintiffs' Complaint Fails to Allege an Injury in Fact............................10

        B.    Plaintiffs' Allegations Regarding Division of Resources and Chilling of Speech Do Not Establish Standing .........................................................14

        C.    Plaintiffs Cannot Establish Standing Merely By Citing to Events That Took Place in Portland ...................................................................................16

    II.    Plaintiffs Fail to State a Claim under the Tenth Amendment ...............................17

Conclusion ..............................................................................................................20

# Table of Authorities

**Cases**

*Aurora Loan Serv., Inc. v. Craddieth*, 442 F.3d 1018 (7th Cir. 2006) ......................................... 16

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012) ................................................................................. 14

*Citadel Group Ltd. V. Washington Reg'l Med. Ctr.*, 692 F.3d 580 (7th Cir. 2012) ...................... 2

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ................................................................... 12, 13

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ............................................................... 11, 16

*Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019) ............................................. 15

*Doe v. County of Montgomery, Ill.*, 41 F.3d 1156 (7th Cir. 1994) .................................. 11, 12, 16

*EEOC v. Wyoming*, 460 U.S. 226 (1983) ..................................................................................... 18

*Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999) ................................................. 19

*H.O.P.E., Inc. v. Alden Gardens of Bloomingdale, Inc.*, 2017 WL 4339823 (N.D. Ill. Sept. 29, 2017) ............................................................................................................................................ 15

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ............................................................. 15

*Index Newspapers LLC, et al. v. U.S. Marshals Service*, 2020 WL 4883017 (D. Or., Aug. 20, 2020) ......................................................................................................................................... 2, 5

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490 (7th Cir. 2005) ...................................................................................................................................... 10, 11

*Laird v. Tatum*, 408 U.S. 1 (1972) .............................................................................................. 14

*Lopez-Aguilar v. Marion Cty. Sheriff's Dept.*, 924 F.3d 375 (7th Cir. 2019) ............................. 11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................ 10, 11

*Mainstreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742 (7th Cir. 2007) .................. 16, 17

*Nat'l League of Cities v. Usery*, 426 U.S. 833 (1976) ................................................................. 18

*New York v. United States*, 505 U.S. 144 (1992) ........................................................................ 18

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ................................................................................... 12

*Robinson v. City of Chicago*, 868 F.2d 959 (7th Cir. 1989) .......................................................... 13

*Rosenblum v. Does 1-10*, 2020 WL 4253209 (D. Or. July 24, 2020).......................................... 3, 4

*Speech First, Inc. v. Kileen*, 968 F.3d 628 (7th Cir. 2020) ..................................................... 11, 14

*Tex. Indep. Prod. And Royalty Owners Assoc. v. Env'l Prot. Agency*, 410 F.3d 964 (7th Cir. 2005) ....................................................................................................................................... 11

*Travis v. Reno*, 12 F. Supp. 2d 921 (W.D. Wis. 1998) ................................................................. 19

*Valley Forge Christian College v. Americans United for Sep. of Church & State, Inc.*, 454 U.S. 464 (1982)........................................................................................................................................ 17

*Warth v. Seldin*, 422 U.S. 490 (1975) .......................................................................................... 10

**Statutes**

8 U.S.C. § 1357.................................................................................................................................. 7

19 U.S.C. § 1589a.............................................................................................................................. 7

21 U.S.C. § 13.................................................................................................................................... 7

28 U.S.C. § 533.................................................................................................................................. 6

28 U.S.C. § 566............................................................................................................................. 7, 19

31 U.S.C. § 41503.............................................................................................................................. 7

40 U.S.C. § 1315(a) ...................................................................................................................... 6, 19

40 U.S.C. § 1315(b)(1) ..................................................................................................................... 6

40 U.S.C. § 1315(b)(2) ................................................................................................................. 6, 19

**Regulations**

28 C.F.R. § 0.111(f) ......................................................................................................................... 19

| | | |
|---|---|---|
| BLACK LIVES MATTER CHICAGO, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) ) | No. 20 C 4319 |
| v. | ) ) | Judge Pallmeyer |
| CHAD WOLF, *et al.*, | ) ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### Introduction

Plaintiffs are organizations involved in protests in Chicago who fear that federal agents deployed to Chicago will interfere with plaintiffs' peaceful protests and unlawfully arrest their members.  (Or at least that is what they feared when this case was filed two months ago.)  This fear was not based on events in Chicago, but rather on events in Portland, where plaintiffs allege federal agents deployed to protect federal property violated the constitutional rights of other protestors in Portland.  Plaintiffs' fears have not been realized; not only have plaintiffs here not suffered any injury, but they cite nothing to suggest injury is likely.  Plaintiffs' own allegations and referenced documents show that the federal agents most recently deployed to Chicago were sent to work *with* local law enforcement to fight the rise in violent gun and gang crime pursuant to a federal law enforcement initiative called Operation LeGend, which by design is not directed at policing protesters or protecting federal property.  Because plaintiffs' fear of future injury is at best speculative, they have no standing to pursue their claims in this case.  Even if they had standing, plaintiffs' Tenth Amendment claim should still be dismissed for failure to state a claim.

**Background**

**I.     The Situation in Portland**

Protests against racial injustice and police brutality have occurred in cities across the United States after George Floyd's tragic death on May 25, 2020.  Am. Complt. ¶¶ 32-33.   In Portland, Oregon, riots associated with these protests resulted in vandalism, property destruction, attacks on law enforcement officers, attempted arson, and related acts of violence in connection with federal buildings and property.  *See Index Newspapers LLC, et al. v. U.S. Marshals Service, et al,* 2020 WL 4883017, \*14 (D. Or. Aug. 20, 2020); July 16, 2020 Memo to DHS Acting Secretary Chad Wolf at 1 ("7/16/20 DHS Memo").[1]  In early July 2020, for example, some of the rioters in Portland broke the glass doors at the entryway of the Hatfield Federal Courthouse in Portland.  *Id.*  On other nights in July, rocks and other objects were thrown at federal agents protecting the courthouse, and on one occasion certain rioters attempted to start a fire inside the Hatfield Federal Courthouse.  *Id.*

In response to this damage to federal property and these assaults on federal officers, the U.S. Department of Homeland Security (DHS) as well as the U.S. Marshals Service (USMS) deployed specialized tactical teams to provide support in protecting the federal courthouse and other federal property in Portland.  Am. Complt. ¶¶ 78-79, 83; 7/16/20 DHS Memo at 1.  According to plaintiffs' amended complaint, these federal agents approached protesters in Portland by using unmarked vehicles and dressed in camouflage uniforms that failed to identify themselves

---

[1]   This document, 7/16/20 DHS Memo, is cited in the amended complaint at ¶ 78, and attached hereto as Exhibit 1.  *See Citadel Group Ltd. V. Washington Reg'l Med. Ctr.*, 692 F.3d 580, 591-92 (7th Cir. 2012) ("In deciding a motion to dismiss for failure to state a claim [courts] may consider documents attached to or referenced in the pleading if they are central to the claim.").

2

as federal agents. Am. Complt. ¶¶ 68, 81. Plaintiffs further allege that federal agents (again, in *Portland*) engaged in unlawful police tactics against protesters, journalists, and legal observers based on their viewpoint, including (1) unlawfully arresting them without probable cause, (2) conducting unlawful domestic surveillance against them, and (3) trying to silence and interfere with protesters through intimidation and force. *Id.*, ¶¶ 70-74, 91-128.

Oregon's governor and Portland's mayor requested the removal of federal agents from Portland. Am. Complt. ¶ 90. Oregon's Attorney General filed a federal lawsuit on July 17, 2020, seeking to enjoin federal agents from engaging in this alleged unlawful conduct. Am. Complt. ¶ 89; *Rosenblum v. Does 1-10*, 2020 WL 4253209 (D. Or. July 24, 2020).[2] Several other lawsuits were filed in Portland, challenging conduct by federal agents surrounding the protests. Protesters in *Wise v. City of Portland*, No. 3:20-cv-1193 (D. Or.), sued DHS, alleging their treatment of plaintiffs during protests in Portland was unlawful. Anti-police organizations in *Western States Center, Inc. v. DHS*, No. 3:20-cv-1175 (D. Or.), sued DHS and USMS, alleging that federal law enforcement in Portland violated the First, Fourth, and Tenth Amendments. Members of the press and legal observers in *Index Newspapers LLC v. City of Portland, et al.,* No. 3:20-cv-1035-SI (D. Or.), sued the City of Portland, DHS, and USMS, challenging their treatment of plaintiffs during protests as unlawful.

---

[2] The district court in Portland denied the Oregon Attorney General's motion for a temporary restraining order on standing grounds, *Rosenblum*, 2020 WL 4253209, and plaintiff subsequently dismissed the case.

## II.     The Situation in Chicago

Meanwhile, on July 20, 2020, Chicago Mayor Lori Lightfoot sent a letter to President Trump regarding federal resources needed to reduce gun violence in Chicago.  Am. Complt. ¶¶ 156, 158; Lightfoot July 20, 2020 Letter to President Trump, at p. 1 ("7/20/20 Lightfoot Letter").[3]  Regarding law enforcement assistance, Mayor Lightfoot stated that Chicago does not want any deployment of secret federal agents who arrest without cause, as had allegedly occurred in Portland.  *Id.* at 2.  Instead, Mayor Lightfoot requested more federal "investigatory resources to augment existing federal violent crime suppression efforts, under the leadership and control of the U.S. Attorney" and explained that "[g]iven the urgency of the gun violence," Chicago needs federal violent crime and particularly gun cases investigated and prosecuted.  *Id.*  Two days later, on July 22, Mayor Lightfoot announced that she had spoken with President Trump about the deployment of federal agents to Chicago and that they reached an understanding about such a deployment.  Am. Complt. ¶ 162.

That same day, President Trump and law enforcement officials announced a federal law enforcement initiative called Operation LeGend,[4] whereby the federal government provides crime fighting resources to Chicago (and other cities) that are experiencing a significant rise in violent crime.  Am. Complt. ¶ 129; 7/22/20 Press Conference Transcript, "Remarks by President Trump on Operation LeGend" ("7/22/20 Press Conference Transcript").[5]  During this press conference,

---

[3]  7/20/20 Lightfoot Letter is cited in the amended complaint at ¶ 158 and is attached as Exhibit 2.

[4]  Operation LeGend is named in honor of four-year-old LeGend Taliferro, who was shot and killed in Kansas City, Missouri, on June 29, 2020.

[5]  This July 22, 2020 press conference is cited in the amended complaint at ¶¶ 129,138-40, and the 7/22/20 Press Conference Transcript is attached as Exhibit 3.

President Trump explained that Operation LeGend had already been used successfully in Kansas City and was being expanded to Chicago and Albuquerque due to the rise in violent crime in those cities. *Id.* at 4-5. President Trump explained that in Chicago, for example, 1,900 people had already been shot this year and 414 had been murdered, which is a 50 percent increase over last year. *Id*. at 2.

Attorney General William Barr and Acting Secretary of DHS Chad Wolf explained that Operation LeGend is aimed at protecting people from violent crime and that it is obviously a different type of operation than the tactical teams used to defend federal property against rioters in Portland. 7/22/20 Press Conference Transcript at 7, 9.[6] Federal agents deployed under Operation LeGend are augmenting their longstanding crime fighting activities where federal investigators work jointly with state and local police to solve murders and take down violent gangs. *Id.* at 7-8. As it relates to Chicago, Operation LeGend committed 200 federal agents from the Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), USMS, and DHS to expand Chicago's existing violent crime task forces. Linked to the increase in federal law enforcement officers under Operation LeGend, the United States also provides $61 million in financial assistance to state and local law enforcement for expenses they incur in connection with these federal task force operations. *Id.* at 5, 8.

---

[6] The deployment of federal agents in Portland was under Operation Diligent Valor, not Operation LeGend. *See Index Newspapers*, 2020 WL 4883017 at *12, *15 n.6.

## III.    Federal Law Enforcement Agencies

Law enforcement agents with the Department of Homeland Security as well as the Department of Justice are authorized by Congress to engage in a variety of federal law enforcement activities, which include both the protection of federal property as well as the enforcement of federal criminal laws relating to violent crimes.   The Federal Protective Service (FPS), a component of the DHS, is the federal agency charged with protecting federal facilities.  *See* Federal Protective Service Operation, at https://www.dhs.gov/fps-operations.  Congress authorized DHS to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government." 40 U.S.C. § 1315(a).  While engaged in their duties, FPS officers are authorized to conduct a wide range of law enforcement functions, including carrying firearms, issuing warrants and subpoenas, conducting investigations on and off the federal property in question, making arrests, and enforcing federal laws for the protection of persons and property.   40 U.S.C. § 1315(b)(2).  The Secretary of DHS may also designate DHS employees "as officers and agents for duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property." 40 U.S.C. § 1315(b)(1).

Federal law enforcement agencies within DOJ, including the DEA, ATF, FBI, and USMS, as well as DHS's Homeland Security Investigations (HSI) are authorized to enforce a variety of federal criminal laws relating to violent crime.  The FBI is the primary law enforcement agency for the United States and has authority to gather intelligence and to investigate federal crimes in 200 categories, including violent crime areas of gangs, narcotics, organized crime, robberies, kidnapping, and motor vehicle theft.  28 U.S.C. § 533; *see* https://www.fbi.gov/investigate.  The

DEA has specific authority to investigate drug trafficking and distribution under the Controlled Substances Act, 21 U.S.C. § 13, *et al*. *See* https://admin.dea.gov/mission. ATF has authority to investigate federal crimes for illegal use, possession, and transfer of firearms under the Gun Control Act, 18 U.S.C., Chapter 44 and the National Firearms Act, 26 U.S.C., Chapter 53. USMS is the enforcement arm of the federal courts and is responsible for protecting the federal judiciary, apprehending federal fugitives, managing and selling seized assets, and housing and transporting federal prisoners. 28 U.S.C. § 566; 31 U.S.C. § 41503; 28 C.F.R. § 0.111. HSI investigates and enforces laws related to cross-border criminal activity, including narcotics and weapons smuggling/trafficking, human smuggling, and transnational gang activity. *See* 19 U.S.C. § 1589a; 8 U.S.C. § 1357; https://www.ice.gov/hsi. In enforcing these laws, federal agents regularly cooperate with state and local law enforcement officials, which often takes the form of joint task forces in which federal agents work with state and local officials to fight crime committed under federal laws. *See, e.g.*, https://www.fbi.gov/investigate/violent-crime/gangs; 28 U.S.C. § 566; 28 C.F.R. § 0.111.

## IV.     Amended Complaint

Plaintiffs in this action are a group of organizations that have been and will continue to be involved in Chicago protests against police violence and systemic racism, stemming from George Floyd's death ("Chicago Protests"). Am. Complt. ¶¶ 4, 34-38. Plaintiffs include (1) six organizations whose members regularly plan and participate in Chicago Protests;[7] (2) two

---

[7] These plaintiffs include (1) Black Lives Matter Chicago (BLM), (2) Black Abolitionist Network (BAN), (3) Chicago Democratic Socialists of America (CDSA), (4) Good Kids/Mad City (GKMC), (5) #Letusbreathe Collective, and (6) South Siders Organized for Unity and Liberation (SOUL).

organizations whose members provide legal support and observers for those engaged in Chicago Protests;[8] and (3) one organization, In These Times (ITT), that operates a magazine and provides journalism coverage for Chicago Protests. *Id.*, ¶¶ 10-18. Plaintiffs bring this action on behalf of themselves and their members and assert claims against various federal law enforcement agencies within DHS and DOJ that have deployed federal agents to Chicago as well as unknown officers of the United States. *Id.*, ¶¶ 20-31.[9]

Based on the events in Portland, plaintiffs feared that the federal agents recently deployed to Chicago to fight gun and gang violence would instead be used to intimidate, physically abuse, and unlawfully arrest peaceful protesters in Chicago, similar to what they allege to have occurred in Portland. Plaintiffs do not allege that any illegal federal law enforcement conduct *has* already occurred in Chicago, but claim that if it does, their members may be subject to such unlawful conduct and the organizations may have to divert resources to address it. Am. Complt. ¶¶ 10-18. Other than this generalized fear of future harm, plaintiffs allege that one organization, National Lawyers Guild, has already diverted resources in order to distribute "Know Your Rights" fliers due to protester inquiries about encountering federal agents at protests. Am. Complt. ¶¶ 178-79. Additionally, in the original complaint filed on July 23, 2020, plaintiffs alleged that due to deployment of federal agents to Chicago, certain BLM members would not be attending protest activity planned for the upcoming weekend of July 24-26. Complt. ¶ 142. In the amended

---

[8] These plaintiffs include (1) National Lawyers Guild Chicago (NLG Chicago); and (2) First Defense Legal Aid (FDLA).

[9] In addition to DOJ and DHS, additional defendants include investigative arms within DOJ (FBI, DEA, ATF, and USMS), as well as components within DHS (HSI, ICE, CBP, and FPS). Am. Complt. ¶¶ 20-30.

complaint filed a week later on July 31, however, plaintiffs note only that their members engaged in the protests of July 24-26, but do not allege that any members refused to participate because of fear of federal agents or that anyone encountered any problems at all from federal law enforcement officers.[10]

Based on these allegations, plaintiffs assert three constitutional claims. First, plaintiffs allege that their members have a "well-founded fear" that the federal agents deployed to Chicago on July 22 were going to brutalize and kidnap plaintiffs' members for no reason other than engaging in protected First Amendment activity. As a result, plaintiffs claim that their First Amendment rights to speak, assemble, petition, and gather news are being chilled and will be violated in the future if federal agents engage in misconduct. Am. Complt. Ct. I. Second, plaintiffs claim that in the absence of an injunction, federal agents deployed to Chicago will unlawfully arrest and seize plaintiffs' members in violation of the Fourth Amendment. Am. Complt. Ct. II. Third, plaintiffs allege that the federal agents deployed to Chicago will be conducting "traditional law enforcement activities on the streets and sidewalks of Chicago" and thus will be encroaching upon powers explicitly reserved to the State of Illinois in violation of the Tenth Amendment. Am. Complt. Ct. V. For relief, plaintiffs seek only equitable relief, including declarations that defendants' actions infringe on plaintiffs' First and Fourth Amendment rights and a permanent injunction, prohibiting defendants from engaging in unconstitutional conduct.

---

[10] Instead, plaintiffs simply repeat in the amended complaint the same allegation from the original complaint that certain BLM members will not "attend the protests and rallies planned for this weekend because they fear federal agents will kidnap, falsely arrest, or physically abuse them, as they did to protestors in Portland." *Compare* Complt. ¶ 142 *with* Am. Complt. ¶ 176.

**Argument**

The protests that have taken place in recent months here in Chicago and throughout the country touch on matters of great concern to many Americans, and it is vital to our democracy that First Amendment rights of all Americans be respected. But in this case, plaintiffs have alleged that by taking part in protests here in Chicago, they are afraid they might be subject to an injury at some undetermined time in the future based on reports of what has happened in Portland. The Constitution requires more than that to make out a claim in federal court. The plaintiffs have failed to meet their burden at this stage in the litigation to plead a case that shows injury in fact, and for this reason their case should be dismissed. Even if plaintiffs adequately were able to allege injury in fact for purposes of standing, their Tenth Amendment claim should be dismissed for failure to state a claim.

**I.        Plaintiffs Lack Article III Standing.**

**A.        Plaintiffs' Complaint Fails to Allege an Injury in Fact.**

Plaintiffs' complaint contains a great deal of speculation about what injury *might* befall the members of the various plaintiff organizations, but nowhere does the complaint allege the kind of concrete, particularized injury that is necessary to establish standing under Article III. The question of standing is, in essence, "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 495 (7th Cir. 2005). As such, the doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" of standing contains three elements: an injury in fact; a

causal link between the injury and the challenged action such that the challenged conduct is fairly traceable to the defendant; and redressability through a favorable court decision. *Id.* at 560-61 (1992); *Lopez-Aguilar v. Marion Cty. Sheriff's Dept.*, 924 F.3d 375, 384-85 (7th Cir. 2019). In cases such as this one where the plaintiffs are associations or civic groups, an association has standing to represent the interests of its members if the individual members would have standing in their own right; the interests represented are germane to the association's purpose; and the relief sought does not require the participation of the individual members. *Tex. Indep. Prod. And Royalty Owners Assoc. v. Env'l Prot. Agency*, 410 F.3d 964, 971 (7th Cir. 2005); *Speech First, Inc. v. Kileen*, 968 F.3d 628, 638 (7th Cir. 2020). At all times, it remains the plaintiffs' burden to establish the elements of standing where the plaintiff is the party invoking federal jurisdiction over the alleged case or controversy. *Doe v. County of Montgomery, Ill.*, 41 F.3d 1156, 1159 (7th Cir. 1994).

Here, plaintiffs' amended complaint fails to allege an injury in fact that satisfies the first requirement of Article III standing. An "injury in fact" is an "invasion of a legally-protected interest which is (1) concrete and particularized, that is, affecting the plaintiff in a personal and individual way and (2) actual or imminent and not merely conjectural or hypothetical." *Id.* (citing *Lujan*, 504 U.S. at 561); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (the "threatened injury must be certainly impending" and not merely "possible"); *Speech First, Inc.*, 968 F.3d at 638. The requirement that the injury be "particularized" means that a plaintiff cannot simply "raise only a generally available grievance about the government." *Lac Du Flambeau*, 422 F.3d at 496. Where the plaintiff "claims only harm to his and every citizen's interest in proper application of the Constitution and laws, and [seeks] relief that no more directly and tangibly

benefits him than it does the public at large," the plaintiff fails to state an Article III case or controversy. *Id.*

Such is the case with plaintiffs here. The amended complaint contains multiple allegations of events that occurred in *other* cities and of statements made by the President, the Attorney General, and the Acting Secretary of DHS, Am. Complt. ¶¶ 130-135, but alleges no injury that is *particular* and *concrete* with regard to the plaintiff organizations' members in *this* city. Rather, by merely detailing events in the national news and quotes from high-level government officials, plaintiffs' amended complaint simply alleges "the psychological consequence presumably produced by observation of conduct with which one disagrees." *Doe*, 41 F.3d 1156 at 1159. Such claims fall well short of the case or controversy standard.

The Supreme Court case *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), is instructive. In *Lyons*, the plaintiff sought declaratory relief and an injunction barring the City of Los Angeles from violating his civil rights based on allegations that members of the Los Angeles Police Department had previously used illegal chokeholds to restrain the defendant. *Id.* at 98. The Court, relying on precedent, held that "past exposure to illegal conduct does not itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 102 (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). The simple assertion that the plaintiff in *Lyons* might again be subject to an illegal chokehold did not create the actual controversy that must exist for a declaratory judgment to be entered. *Id.* at 104. In order to establish an actual controversy in the case, the plaintiff in *Lyons* needed to allege either that *all* Los Angeles police officers *always* apply chokeholds to any citizen they encounter, or that the City had explicitly ordered or authorized such behavior. Even an official policy that simply

allowed for the challenged conduct is insufficient. Mere instances of past misconduct did not establish a right to declaratory relief. *Id*. at 106.

The claims in this case fare no better. Here, plaintiffs are not even alleging that they previously suffered a discrete, concrete injury (such as the chokehold in *Lyons*). Rather, they allege that *other* individuals in *another* city have suffered some particular injury, and for that reason plaintiffs are afraid they might suffer a similar fate at some abstract point in the future. Plaintiffs' alleged threat of injury is even more speculative, given the different circumstances presented in Portland and Chicago. Plaintiffs do not allege that federal property in Chicago has come under attack or that federal agents have been deployed to Chicago to protect federal property and patrol protesters. Rather, the complete statements of federal officials that plaintiffs selectively cite in their amended complaint make clear that federal agents have been deployed to Chicago to augment their longstanding work in fighting violent gun and gang crime in Chicago (in other words, more of the same). Plaintiffs have no present injury of their own that can be remedied by this court, and any future injury they might suffer is purely hypothetical. Thus, the prayer for relief in this case — which seeks only injunctive and declaratory relief — is attempting to remedy an abstract injury that simply does not exist and at this point cannot be credibly alleged. *See id*. at 105; *Robinson v. City of Chicago*, 868 F.2d 959, 967 (7th Cir. 1989) (applying the rule in *Lyons* and holding that, "plaintiffs cannot show irreparable injury precisely because they cannot show a real or immediate threat that they will be wronged again, while any previous injury can be . . . compensated for by damages").[11]

---

[11] The lack of a concrete, imminent injury is fatal to *all* of the individual claims in plaintiffs' amended complaint, for the reasons stated herein. In addition, plaintiffs' Tenth Amendment claim suffers a further defect discussed in Section II, *infra*.

**B.** **Plaintiffs' Allegations Regarding Diversion of Resources and Chilling of Speech Do Not Establish Standing.**

Plaintiffs' amended complaint attempts to allege a concrete injury based simply on "fear" that they will be subject to unlawful abuse at some future point in time, but plaintiffs' subjective fear of chilling (assuming that it still exists a couple of months later and with the benefit of hindsight) does not in itself establish standing under Article III. Am. Complt. ¶ 173. Likewise, plaintiffs' claim about the "diversion" of financial resources lacks any basis in law for circumstances such as these, where there is no actual policy or action by the government that plaintiffs must divert resources to combat. Am. Complt. ¶ 177.

Plaintiffs' purported fear that they might be subject to injury does not establish Article III standing because, again, on its face plaintiffs' amended complaint does not demonstrate that their subjective fear is grounded in actual facts relating to *Chicago*. In free speech cases brought under the First Amendment, a plaintiff's "notional or subjective fear of chilling is insufficient to sustain a court's jurisdiction under Article III." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) (denying plaintiff's First Amendment claim involving fear of unlawful surveillance during protest activity). In order to establish standing, the plaintiff must "substantiate a concrete and particularized chilling effect on his protected speech or expressive conduct" to pursue prospective relief. *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012); *Speech First, Inc.*, 968 F.3d at 639. Plaintiffs here originally alleged that certain BLM members would not attend a protest scheduled for the weekend of July 24-26 out of fear they might suffer injury, but then the July 24 weekend came and went, and plaintiffs' post-July 24-weekend amended complaint makes no mention of any infringement of First Amendment rights that took place. Instead, plaintiffs simply make a vague statement that

they have "protests and political actions into the foreseeable future," but do not allege that any members are too fearful to attend. Am. Complt. ¶ 166.

Plaintiffs' claims about diversion of financial resources are also insufficient to establish an injury in fact. It is true that for certain advocacy groups, the deflection of the group's time and money to legal efforts can qualify as an injury for purposes of Article III. *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (upholding "drain on resources" standing in the context of an organization that works to combat discrimination in housing); *H.O.P.E., Inc. v. Alden Gardens of Bloomingdale, Inc.*, No. 15 C 9715, 2017 WL 4339823 at * 5 (N.D. Ill. Sept. 29, 2017) (same). But the cases that stand for this proposition are universally ones that deal with issues such as voting rights, housing discrimination, and immigration — areas in which the plaintiffs are able to allege there is an actual policy, rule, or law that is enforced by the defendants and will have the effect of diverting the group's resources. *See Common Cause Indiana v. Lawson*, 937 F.3d 944, 953 (7th Cir. 2019) (collecting cases). Plaintiffs still must show that there are new, concrete burdens created by the law being challenged, that the disruption to the organization's operations is real, and that its response is warranted. *Id*. at 955. The allegation in the present case — that the plaintiff National Lawyers Guild Chicago has printed "Know Your Rights" fliers and information for protestors — does not amount to a claim that defendants have actually *injured* plaintiffs in a concrete way. Am. Complt. ¶ 179.[12] There is no claim of a specific rule or policy in effect that plaintiffs are compelled to combat. *See Common Cause Indiana*, 937 F.3d at 955 (noting that

---

[12] The amended complaint also alleges that a group denoted as "OCAD" "has had to redirect their staff and financial resources" as a result of defendants' alleged conduct. Am. Complt. ¶ 178. However, it is not clear from the amended complaint who OCAD is, what the acronym stands for, or whether OCAD was intended to be named an actual plaintiff in this lawsuit.

organizations do not have standing based solely on the baseline work they are already doing —
they "cannot convert ordinary program costs into an injury in fact").

Finally, a plaintiff cannot simply create an injury by undertaking action to avoid harm.
*Clapper*, 568 U.S. at 416 (plaintiffs "cannot manufacture standing merely by inflicting harm on
themselves based on their fears of hypothetical future harm that is not certainly impending").
When such self-imposed harm is based on an injury that is too speculative, it is not fairly traceable
to the defendant's conduct. *Id.* As explained above, plaintiffs' alleged fear that their members'
First and Fourth Amendment rights will be violated while engaging in peaceful protests in Chicago
is exceedingly speculative. Accordingly, any diversion of resources or concrete chilling effect
based on this fear is not fairly traceable to defendants' conduct.

### C. Plaintiffs Cannot Establish Standing Merely by Citing to Events That Took Place in Portland.

Ultimately, this case was not filed in Portland, and it cannot be maintained based merely
on the events that are alleged to have taken place 1800 miles away. The doctrine of standing "is
not an ingenious academic exercise in the conceivable." *Doe*, 41 F.3d at 1162. An individual who
simply reads about events affecting someone else in another state cannot bring suit on the theory
that he himself is injured. *Mainstreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 745 (7th
Cir. 2007); *see also Aurora Loan Serv., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006)
("There is a sense in which I am 'injured' when I become upset by reading about the damage
caused that fine old vineyard in Burgundy by a band of marauding teetotalers, yet that injury would
not be an 'injury' that conferred standing to sue under Article III.").

Even if it *were* the case that the events in Portland could form the basis for an articulable
injury in Chicago, this case would still be improper under the doctrine of prudential standing.

16

*Mainstreet*, 505 F.3d at 745; *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474-75 (1982).  That is, a set of facts should not be litigated by a plaintiff whose injury, if any, is derivative from the actual immediate victims of the alleged conduct.  *Mainstreet*, 505 F.3d at 745.  In other words, individuals in Portland are perfectly capable of vindicating their own rights and prosecuting their own case where warranted.  Many groups in Portland are already doing so.  *See* Background Section I, *supra*.  But Chicagoans are not directly affected by those events, and the "victims with the largest stakes" who have first-hand information about the facts in Portland are the ones best situated to bring those cases.  *Id*.  Absent a particular injury that is specific to the events and plaintiffs here in Chicago (and no such injury is alleged in plaintiffs' amended complaint), there is no case or controversy to be litigated *here*.[13]

## II. Plaintiffs Fail to State a Claim Under the Tenth Amendment.

Standing issues aside, plaintiffs' Tenth Amendment claim is both impermissibly broad and vague.  While plaintiffs vaguely complain that federal law enforcement is impermissibly conducting "traditional state law enforcement activities" in Chicago, they do not cite to a specific statute that they claim violates the Tenth Amendment's limit to federal legislative authority.  Nor can plaintiffs allege that the type of federal law enforcement activity being conducted in Portland or Chicago is beyond that authorized by Congress or interferes in any way with State law enforcement.

The Tenth Amendment to the United States Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved

---

[13] Plaintiffs' lack of standing requires dismissal of not just their three constitutional claims in Counts I, II, and V, but also their Declaratory Relief Act claim in Count III and their conspiracy claim in Count IV, since these two claims are derivatives of the constitutional claims.

to the States respectively, or to the people." Indeed, the Tenth Amendment protects the states from federal intrusion that might threaten their separate and independent existence. *EEOC v. Wyoming*, 460 U.S. 226 (1983). Simply put, the Tenth Amendment serves as an affirmative external limitation on federal *legislation*. *Nat'l League of Cities v. Usery,* 426 U.S. 833 (1976); *see also New York v. United States,* 505 U.S. 144, 188 (1992) (Congress may neither "compel the States to enact or administer a federal regulatory program.").

Plaintiffs' theory under the Tenth Amendment is not only atypical but is impermissibly broad. Plaintiffs vaguely allege that the defendants are "encroaching upon powers explicitly reserved to the State of Illinois [] and to Illinois citizens" by "conducting traditional law enforcement activities on the streets and sidewalks of Chicago." Am. Complt. ¶ 211. They claimed when the case was filed that a federal "secret police force" would be deployed in Chicago and that there "would soon be an unchecked federal presence on the streets of Chicago." *Id.* ¶ 141; *see generally id.* ¶¶ 130-155. Aside from the fact that that did not happen, what is glaringly missing from the complaint is any claim that a specific *federal law* violates the Tenth Amendment. Indeed, plaintiffs do not cite to a specific statute or in any way allege that a piece of federal legislation violates the Tenth Amendment.

Further, while the plaintiffs complain that the defendants are "encroaching upon powers explicitly reserved to the State of Illinois," they do not articulate what specific powers they are referring to. A broad review of meritorious Tenth Amendment case law demonstrates that Tenth Amendment lawsuits commonly challenge congressional authority to legislate and do not address generalized complaints of federal law enforcement powers. *See, e.g., New York*, 505 U.S. at 155 (discussing Tenth Amendment jurisprudence and stating: "In some cases the Court has inquired

whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I of the Constitution. In other cases courts have sought to determine whether an Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment." (internal citations omitted)); *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999) (concluding that federal Gun Control Act of 1968 did not violate Tenth Amendment); *Travis v. Reno*, 12 F. Supp. 2d 921, 928 (W.D. Wis. 1998) (collecting Tenth Amendment cases addressing various federal statutes). Ultimately, the amended complaint fails to portray a picture of how the federal defendants are commandeering a state regulatory scheme.

To the extent that engaging in "traditional law enforcement activities" could somehow establish a valid Tenth Amendment claim, it would still fail in this case because the actions that plaintiffs complain of in Portland and Chicago relate exclusively to *federal* law enforcement powers and are not limited by, nor do they conflict with, *state* law enforcement. Plaintiffs' alleged wrongdoing by DHS agents in Portland arises out of the agents' efforts to protect federal property and federal officers. As explained above, DHS agents are authorized to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government." 40 U.S.C. § 1315(a). As part of this authority, a federal law enforcement officer may enforce federal laws, make arrests without a warrant if the federal officer has reasonable grounds to believe a felony has been committed, and conduct investigations into wrongdoing that may have occurred on federal property. 40 U.S.C. § 1315(b)(2); *see also* 28 U.S.C. 566; 28 C.F.R. § 0.111(f). Similarly, federal agents fighting violent crime in Chicago under Operation LeGend are authorized to do so under a variety of federal criminal laws such as those relating to guns and drugs. Indeed, plaintiffs appear to concede in their amended complaint that fighting such violent crime by federal

agents is not only common but lawful.  Am. Complt. ¶ 159 ("Chicago is already saturated with federal law enforcement agents who conduct duly authorized law enforcement activities").  Plaintiffs' vague Tenth Amendment claim fails to explain how federal officers in Chicago are attempting to enforce state or local law or are prohibiting state entities from doing anything related to their own police powers.  Accordingly, plaintiffs cannot state a claim that the federal agents' law enforcement activity in Portland or Chicago violates the Tenth Amendment.

## Conclusion

For the foregoing reasons, the court should dismiss plaintiffs' amended complaint.

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By: s/ Kathleen M. Flannery
    KATHLEEN M. FLANNERY
    NIGEL B. COONEY
    PATRICK W. JOHNSON
    Assistant United States Attorneys
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 353-7223
    kathleen.flannery@usdoj.gov